HOME RENTALS CORPORATION, Plaintiff and Counterdefendant-Appellant, v. CHRIS CURTIS et al., Defendants and Counterplaintiffs-Appellees.

Fifth District   No. 5—91—0483

Opinion filed October 28, 1992.

Gregory A. Veach and Craig R. Reeves, both of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellant.

No brief filed for appellees.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Home Rentals Corporation (Home Rentals), appeals from a judgment of the circuit court of Jackson County which denied its claim for money damages for breach of a residential lease and awarded defendants, Chris Curtis, Ed Domaracki, Mike Fraser, and Carson Flugstad, the sum of $1,980 plus costs on their counterclaim for constructive eviction. We affirm.

The record, when viewed in the light most favorable to defendants, the prevailing parties, established that Home Rentals owns approximately 300 rental properties, including a single-family residence located at 512 S. Beveridge near Southern Illinois University in Carbondale. Home Rentals agreed to rent the Beveridge house to the four defendants in this action, each of whom was a student at SIU. The terms of the agreement were governed by a written lease signed on behalf of Home Rentals by its president, Henry Fisher, in February of 1989. The lease was to commence on August 17, 1989, and to expire on August 13, 1990. Rent was fixed at $740 per month, and a $500 damage deposit was required. By payments made in April, May and June, defendants gave Home Rentals a total of $1,980 to cover the damage deposit plus advance rent for the last two months of the lease term.

Under the lease defendants were to receive the premises "in good order and repair." While there is no dispute that the house was in acceptable condition when the lease was signed in February, the record established that the situation had changed drastically by the time defendants attempted to take possession six months later. The first to reach the scene was Mike Fraser, who arrived in Carbondale from his home in northern Illinois on August 15. At that time the electricity had not yet been turned on, and he was not able to view the premises during daylight hours until Wednesday, August 16. What Fraser found then was a house that was not fit for human habitation.

Roaches had overrun the rooms. The kitchen was so filthy and so infested by bugs that food could not be stored there. The living room carpet smelled, and one could actually see outside through holes in the wall around the frame of the front door. The bathrooms were unsanitary, and when the water was turned on the following day, August

17, Fraser discovered that not one of the toilets in the building worked. He also discovered that one of the bathtubs did not drain at all, while another drained only slowly, and that bathroom waste water drained directly onto the floor of the basement. In attempting to explain this open drain at trial, Henry Fisher tried to assert that it was simply part of the washing machine hookup. As evidence that this was laundry-related, he pointed to white matter on the basement floor by the drain which he claimed was spilled laundry detergent. Other evidence indicated, however, that the white matter was, in fact, a mass of roach eggs.

As the remaining defendants began to arrive for the start of school, they found the same conditions discovered by Fraser. They and their friends described those conditions to the court at trial, and photographs depicting the squalid conditions were admitted into evidence. Fraser testified that he spoke with Fisher at Home Rentals on the 16th and told him that the place was uninhabitable because of the filth and the roaches. Fisher's response was to suggest that the students buy roach bombs and cleaning supplies to take care of the problems themselves, although he did offer to reimburse them for those items and represented that he would arrange to have an exterminator spray.

Fraser contacted Home Rentals again the following day after discovering the plumbing problems. Fraser notified the company of those problems, complained again about the overall dirtiness of the house, and reported that the roach problem was even more severe than originally thought. This time he was told by the secretary that someone would be sent to "check it out." By the time the lease term commenced the following day, however, defendants were still waiting for a Home Rentals representative to visit.

Hopeful that the situation might somehow be salvaged, defendants spent several days attempting on their own to make the house liveable. Although an exterminator finally appeared on Friday, August 18, or Saturday, August 19, the problem of roach infestation continued, and Home Rentals did nothing about the dirt or plumbing problems. The condition of the house was so bad that defendants were never able to spend the night there. Henry Fisher himself admitted that he would not have moved in either, at least not until after the exterminator had sprayed and the dead roaches were removed. The closest defendants came to occupying the premises was when they unloaded some of their personal property from the rental truck they were using so that the truck could be returned on time.

On Monday, August 21, defendants finally gave up. They packed up their property and sought housing elsewhere. While this was happening, someone from Home Rentals appeared at last with a plunger, presumably to work on the toilets, but by this time defendants' patience was exhausted. They went to the Home Rentals office, advised that they would not be living in the house, and returned the keys. They also reported the condition of the house to the City of Carbondale's Code Enforcement Division.

Following an inspection on August 23, 1989, the Code Enforcement Division notified Home Rentals that it had found numerous violations of the city's codes and ordinances. These included open sewers in the basement, the open waste water drain from the upstairs bathroom, unclean and unsanitary conditions in the first- and second-floor kitchens and bathrooms, severe roach infestation, a "stopped up" lavatory basin, no smoke detectors, a broken window, a large hole in the wall, a structurally unsound handrail by the steps to the second floor, and various exterior surfaces which were in need of painting. The notice of violations, dated August 25, 1989, warned Home Rentals that "due to the severe nature of the violations *** and the potential hazard they create to the health, safety and welfare of anyone occupying the structure in its present condition," the house would be deemed "unfit for human habitation" pursuant to the Carbondale Revised Code and would be posted "occupancy prohibited" unless all cited violations were corrected within 72 hours.

By August 28, 1989, 11 days after defendants' lease was to have commenced, Home Rentals finally remedied all of the violations found by the city, with the exception of the exterior painting. Although the city apparently then withdrew its threat to prohibit further occupancy, Home Rentals did not rent the property out to anyone else. Instead, it brought this action against defendants for breach of the lease. For its damages, Home Rentals claimed the sum of $6,900, representing the rent due for all 12 months under the lease, less the two months' advance rent defendants had already paid as part of their deposit. Home Rentals also asked for its costs and attorney fees of $2,300.

Defendants denied Home Rentals' allegations and raised as affirmative defenses breach of implied warranty of habitability and constructive eviction. Based on the theory of constructive eviction, they also asserted a counterclaim seeking return of the $500 damage deposit and $1,480 in advance rent they had previously paid to Home Rentals. These matters were tried to the court, sitting without a jury. As we noted at the outset of this disposition, the court ultimately ruled against Home Rentals on its damage claim and in favor of

defendants on their counterclaim. Following denial of its post-trial motion, Home Rentals now appeals.

The primary argument advanced by Home Rentals is that the circuit court's judgment cannot be sustained on the theory of breach of implied warranty of habitability. As we have just indicated, however, breach of implied warranty of habitability was only one of defendants' affirmative defenses. Defendants also raised the defense of constructive eviction, and constructive eviction, not breach of implied warranty of habitability, was the basis for their successful counterclaim.

■■ A constructive eviction occurs where a landlord has done "something of a grave and permanent character with the intention of depriving the tenant of enjoyment of the premises." (*Applegate v. Inland Real Estate Corp.* (1982), 109 Ill. App. 3d 986, 989, 441 N.E.2d 379, 382.) Because persons are presumed to intend the natural and probable consequences of their acts, constructive eviction does not require a finding that the landlord had the express intention to compel a tenant to leave the demised premises or to deprive him of their beneficial enjoyment. All that is necessary is that the landlord committed acts or omissions which rendered the leased premises useless to the tenant or deprived the tenant of the possession and enjoyment of the premises, in whole or part, making it necessary for the tenant to move. Whether there has been a constructive eviction is a question of fact, and the decision of the trier of fact will not be reversed unless it is against the manifest weight of the evidence. (*Applegate*, 109 Ill. App. 3d at 989, 441 N.E.2d at 382; *John Munic Meat Co. v. H. Gartenberg & Co.* (1977), 51 Ill. App. 3d 413, 416-17, 366 N.E.2d 617, 620.) In this case, there was ample support for the circuit court's judgment.

■■ At oral argument, counsel for Home Rentals asserted that defendants did what they did simply because "the premises did not meet their expectations." The inference, of course, was that defendants were overly particular and that their expectations were unrealistic. It is scarcely unreasonable, however, for tenants paying $740 per month to expect flushing toilets, sewage-free basements, and kitchens that are not overrun with roaches. These are things that Home Rentals failed to provide. What Home Rentals did provide was a house that was clearly and unquestionably unfit for people to live in. As a result, defendants had no alternative but to vacate the premises.

Home Rentals correctly points out that a tenant may not abandon premises under the theory of constructive eviction without first affording the lessor a reasonable opportunity to correct the defects in the property (*Applegate*, 109 Ill. App. 3d at 990, 441 N.E.2d at 383),

but such an opportunity existed here. Home Rentals' president, Henry Fisher, admitted that he actually inspected the premises as early as August 13. While he denied having seen anything wrong, the circuit court could certainly have concluded that the problems found by the defendants and then the City of Carbondale were already in existence at that time, that Fisher was aware of them (or at least of the non-plumbing problems) and that Fisher's protestations to the contrary were simply not credible. In any case, the record is clear that defendants had notified Home Rentals of all their complaints by August 17, when the lease term was scheduled to commence. This was four full days before they finally gave up and moved.

Considering the magnitude of the problems, four days were opportunity enough for Home Rentals to act. Constructive eviction has been found in analogous circumstances where an even shorter period was involved. (See *Applegate*, 109 Ill. App. 3d at 988, 441 N.E.2d at 381-82 (tenant moved in on October 29 and moved out October 31 because of roaches, filth and disrepair).) We note, moreover, that there is no indication that giving Home Rentals additional time would have made any difference. In the four days before defendants left, the only action the company took at all was to send someone out to spray for bugs, which did not work, and to dispatch a man with a plunger. In the end, it was only because of the intervention by the City of Carbondale that Home Rentals implemented the necessary remedial measures.

Home Rentals argues that defendants are precluded from complaining about the condition of the house because they made an oral agreement with Home Rentals "to repair any defective conditions which existed upon the premises when the lease term was to begin." Putting aside the fact that the lease expressly stated that "the entire provisions and conditions of [the parties'] agreement" were contained in the written lease and that "all verbal or oral representations or promises by either party *** are hereby declared to be null and void and of no effect," Home Rentals' claim of an oral agreement is devoid of evidentiary support. Although defendants did decide to follow the suggestion of Home Rentals' president that they buy supplies to try to clean up the filth and combat the roaches themselves, it is clear under any fair reading of the evidence that they did so merely because, at the time, they had no alternative if they hoped to make the house liveable. At no time did they give Home Rentals any cause to believe that it would be excused from ultimate responsibility for correcting these problems, and it is apparent that Home Rentals itself never believed that it was being excused from those responsibilities. After all,

Home Rentals did eventually send an exterminator and a man with a plunger to the house, and it later undertook to correct the deficiencies cited by the Code Enforcement Division at its own expense. It surely would not have done so if the repairs were, in fact, understood to be defendants' responsibility.

Finally, Home Rentals argues that even if a constructive eviction took place, defendants were not entitled to the damages awarded by the circuit court. This contention is also untenable. Fourteen hundred and eighty dollars of the sum awarded here represented the advance rent paid by defendants for the last two months of the lease term, a period which followed the eviction. Because a constructive eviction relieves a tenant of any duty to pay rent for the period after the eviction (*Applegate*, 109 Ill. App. 3d at 991, 441 N.E.2d at 384), Home Rentals can have no legitimate claim to this sum. The remaining $500 was for the damage deposit. Home Rentals claims a contractual right to this deposit, but under the express terms of the lease, the company was entitled to keep the money only to the extent necessary for "paying damages occasioned by occupancy of the premises by the [defendants], or any of them, or occurring during the occupancy of said premises by the [defendants], or any of them, unpaid rental, reasonable cleaning charges, or other expenses occasioned by any of the aforesaid damages." None of these conditions was present here. All of the damage already existed when the lease was to have commenced, and Home Rentals was entitled to no rent. The circuit court was therefore correct in ordering the damage deposit refunded to defendants in full.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

W.A. LEWIS and H. LEWIS, JJ., concur.