YALE TAVERN, INC., Plaintiff-Appellant, v. COSMOPOLITAN NATIONAL BANK, as Trustee, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—92—0510

Opinion filed March 18, 1994.

Kenneth R. Rosenburg, of Dordek, Rosenburg & Associates, of Lincolnwood, for appellant.

Cohn & Cohn, of Chicago (Charles A. Cohn, of counsel), for appellees Cosmopolitan National Bank, Debra A. Dedich, and Frank Micoli.

Paul H. Strecker, of Chicago, for appellee Ora-Don, Inc.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

This is a case of a purported agent who executed two leases for the same property in a land trust for the same period of time. The plaintiff, Yale Tavern, Inc. (Yale), is the lessee under one lease and the defendant, Ora-Don, Inc. (Ora-Don), is the lessee under the second lease. Yale filed a forcible entry and detainer action against Ora-Don and several other defendants. At the close of the plaintiff's case in a bench trial, the judge entered judgment in favor of all defendants. The plaintiff contends that the judge decided the case on an improper basis.

The building at issue, which contains a tavern, is located at 3332 West Irving Park in Chicago and is owned by an Illinois land trust. The trustee is a defendant, Cosmopolitan National Bank (Trustee), and the beneficiaries are Debra Dedich (Dedich) and Marlene Dedich.

The trust agreement provides that the Trustee has no duty regarding the management of the building, but "will *** deal with said property only when authorized in writing to do so" by the beneficiaries or by "such other person or persons as shall be from time to time named in writing by the beneficiar[ies]." It also provides that the beneficiaries "shall *** have the full management of [the building] and control of the selling, renting and handling thereof."

In 1985, Dedich gave a written direction to the Trustee authorizing the Trustee to lease the building to a corporation, 3332, Ltd. She also gave Frank Micoli, the building manager, a written power of attorney authorizing him to "sign and abide by the lease with 3332, Ltd." This lease was executed by Micoli, the Trustee, and 3332, Ltd. 3332, Ltd., took possession of the property and began operating a tavern, the E&J Lounge, in November 1985. The lease term ran until October 31, 1990. On February 16, 1990, an attorney retained by Micoli filed a forcible entry and detainer action against 3332, Ltd., claiming approximately $2,500 in past-due rent plus accrued rent for February 1990.

Micoli and the Trustee then executed two different leases for the building. One was with Yale, and the other was with Ora-Don. In February 1991, Yale filed a forcible entry and detainer action against Ora-Don, the Trustee, Debra Dedich, Frank Micoli, an alleged agent of Dedich, and Frank Jasper, an employee of Ora-Don. Marlene Dedich was not named as a defendant. The complaint did not cite any section of the Forcible Entry and Detainer Act (Ill. Rev. Stat. 1991, ch. 110, par. 9—101 *et seq.*), but alleged that "the defendants unlawfully withhold possession" of the building from Yale and that Micoli was the agent of Dedich "through a written power of attorney attached as Exhibit A." The 1985 power of attorney from Dedich to

Micoli regarding the 3332, Ltd., lease is exhibit A. The complaint further alleged that Micoli, the Trustee, and Dedich granted possession of the building to Yale in a lease but "the defendant" locked Yale out of the building. The complaint requested an order granting Yale possession of the building.

Dedich and Jasper never appeared or answered the complaint; all other defendants answered and participated in the defense. The record includes an order granting Micoli and the Trustee's attorney "leave to amend [their] response to include Debra Dedich." But, no answer by Dedich or amended pleading was filed. In this court, she is represented by the attorney for Micoli and the Trustee.

Both the Yale lease and the Ora-Don lease were admitted into evidence at the bench trial held on Yale's complaint. Both were executed for the purpose of running a tavern in the building. The Yale lease is dated March 21, 1990, and has a term beginning May 1, 1990. The lessor is the Trustee. The lease is signed by Micoli as "agent of lessor," the Trustee "as trustee," and Jess Yale, the president of Yale. At the bottom of the lease, the Trustee added a typed paragraph stating that the lease is subject to the trust agreement and that it executed the lease "in the exercise of the power and authority conferred upon it [in the trust agreement] *** and under the express direction of the beneficiaries." There is also a rider attached to the lease explaining that the rent should be paid to Micoli and that Micoli "represents that [he] has a valid certificate proving Power of Attorney for [the Trust]." The parties agree that no power of attorney or written direction to the Trustee was executed regarding this lease.

Similarly, there was no power of attorney executed for the Ora-Don lease. Micoli sent a written direction to the Trustee to execute the Ora-Don lease, which he signed "pursuant to Power of Attorney of Debra Ann Dedich." This direction is dated June 26, 1990. The Ora-Don lease is dated March 20, 1990, however, and also has a term beginning May 1, 1990. Again, the Trustee is the lessor. The lease is signed by Martin Henning, the president of Ora-Don, and Micoli as "authorized agent per power of attorney." The line for the Trustee's signature is blank, and there was no evidence that the Trustee ever signed Ora-Don's lease. The lease lists Ora-Don as an Illinois corporation with a named registered agent. Ora-Don's president could not remember exactly when Ora-Don was incorporated but testified that it was "almost a year" before the April 29, 1991, hearing. Yale introduced a document from the Secretary of State listing the date of Ora-Don's incorporation as September 13, 1990.

Yale called Micoli as an adverse witness. Micoli explained that he lived over the tavern and had managed the building for Dedich

for approximately 28 years. He had a new roof installed on the building, had siding put on the building and rented it to many tenants over the years. He collected the rent and dealt with potential tenants. Further, he "took action" to remove 3332, Ltd., from the building. After he signed the lease with Yale, the forcible entry complaint against 3332, Ltd., was dismissed.

Micoli admitted signing the Yale lease; he was present when the Trustee signed the Yale lease on March 23, 1990. He and David Leader, Yale's stepfather and the man with whom Micoli negotiated the Yale lease, went to the bank together to obtain the Trustee's signature. He did not meet Jess Yale, the president of Yale, until the hearing. He first testified that "subsequent to" executing the Yale lease, he signed the Ora-Don lease, and admitted that he signed the Ora-Don lease on June 26, 1990. He later testified that the Ora-Don lease was prepared in January 1990, before the Yale lease, although the Yale lease was signed before the Ora-Don lease. Then he said that the Ora-Don lease was signed first, a "day or two before" the Yale lease. He was never asked to explain why he signed both leases.

On March 23, 1990, Micoli deposited a $5,000 check, payable to him, into the building account. The check lists Jess Yale as the remitter. Micoli testified that Leader gave him this check and that it was for past-due water bills and rent payments owed by the E&J Lounge, for which the eviction suit against 3332, Ltd., was filed. He said the check had "nothing to do with the Yale lease." Micoli had discussed the eviction case with Leader, who owned an amusement company. He believed Leader gave him the $5,000 so that Leader could install his amusement machines in the building. Micoli testified that the amount owed by the E&J Lounge was $5,000, although the complaint against it requested only $2,500. He admitted the case against 3332, Ltd., was dismissed; but he did not testify that the dismissal was related to the $5,000 payment.

Micoli deposited two other checks made out to him, both from Jess Yale, into the building account. One check is dated June 25, 1990, and is for $75. On the memo line, there is a notation "3332 Irv. Water Bill." The other check, dated July 2, 1990, is for $470, the monthly rental amount under the Yale lease, and has "Yale Tavern Account" written on the memo line. In September and October 1990, Micoli received other checks from Jess Yale, but returned those checks to Yale.

Micoli testified that the E&J Lounge was still in possession when he deposited the two Yale checks. However, he admitted sending a note to the Trustee on March 23, 1990, indicating that the E&J Lounge was no longer in possession of the building. Additionally, he

agreed that Yale moved into the building and testified that Yale "put things in [the building]" in May 1990. However, Micoli later testified that, to his knowledge, Yale never was in possession of the building and that he did not know if Yale moved any items into the building because he never entered the tavern portion of the building. He knew that someone changed the locks in January 1991, but he was not sure who changed the locks. He never directed anyone to change the locks and never changed them himself.

Yale also called Henning, Ora-Don's president, as an adverse witness. Henning explained that Ora-Don was occupying the building at the time of the trial and first took possession of the building on November 1, 1990. He received the keys from Micoli and did not have to remove anyone from the building to take possession. There were items in the tavern when he entered it in November; those items are still in the building. He never told anyone to remove any items from the building, and did not remove anything from the building himself. He did authorize someone to change the locks more than once. When he first tried to enter the building on November 1, his keys would not work in the locks. He told Micoli, and Micoli "had the [other locks] cut off by somebody." He had no recollection of calling the police regarding the locks or of meeting with the police at the building. Yale introduced police reports showing that a police officer was at the building on January 15, 1991, and interviewed Jess Yale, Henning and Jasper.

Jess Yale testified that he signed the Yale lease on March 22 or 23, 1990. He said that the $5,000 check to Micoli represented his money, and was given to Micoli pursuant to the lease. (The lease makes no mention of a $5,000 payment.) He gave Micoli the $5,000 in exchange for the keys to the building and the use of the refrigeration system in the building. Leader gives Jess Yale advice but does not have any financial interest in Yale. Jess Yale received the keys to the building after he signed the lease, although the E&J Lounge occupied the building at the time the lease was signed. The E&J Lounge left the building between four and six weeks after he signed the lease. Jess Yale never operated a tavern in the building.

In November 1990, a Yale employee, Bill Allred, went to the building to check the plumbing and reported to Jess Yale that the locks had been changed. Jess Yale and Allred cut the locks off the building and installed new locks. Jess Yale was present on January 15, 1991, when the police were at the building. He saw Henning there along with Jasper, Henning's employee. After January 15, 1991, Jess Yale did not change the locks. The parties stipulated that Yale was never legally evicted from the building.

Leader testified that he has no financial interest in Yale, but helps his stepson with the company. Allred called him in November 1990, because Jess Yale was out of town, and told him the building locks had been changed. Leader went to the building, cut off the lock that had been placed there, and put a new lock in its place. Leader also was present at the building in January 1991, with the police. Leader heard Henning tell a police officer that Henning had removed Yale's lock from the door. Later, sometime in March 1991, Leader drove past the building and saw that the doors were open and a moving truck was parked in front of the building.

Robert O'Donnell, who rents out coin-operated amusement machines, testified that Leader called him in March 1991, and told him that O'Donnell's items were being removed from the building. He drove to the building and found two people removing his pool table and placing it into a moving truck. The pool table had been placed in the building when the E&J Lounge was there, and O'Donnell had an agreement with Jess Yale that the pool table and other O'Donnell equipment would remain in the building as part of Yale's business. O'Donnell regained possession of some of his equipment from the building, but some was stolen and several machines were vandalized. He filed a police report regarding these machines.

Allred testified that Jess Yale asked him to watch over the building and "make repairs from time to time." He had keys to the building, but twice he found that the locks had been changed. He admitted that he changed the locks when his keys would not work. In October 1990, Allred discovered that someone had broken into the building. On January 3, 1991, he checked on the building and found that the locks had been changed and that Jasper was inside the building. He found Jasper in the "back office" of the building. Allred returned to the building on January 15, and again found Jasper in the building. He heard Henning tell a police officer that Henning and Jasper had removed the lock on the building and placed their own lock on the doors.

At the close of Yale's case, Ora-Don and Yale both moved for "directed findings." Yale's motion was denied. In Ora-Don's motion, it set out, without any argument or explanation, the Statute of Frauds. At argument on the motion, Ora-Don's attorney briefly mentioned that "the Statute of Fraud would apply because you have a lease for an excess of one year." Yale's attorney objected to any argument based on the Statute of Frauds, because it had not been pleaded, and the trial judge sustained the objection.

The judge phrased the issue at the hearing on Ora-Don's motion as "the question of who has the superior right of possession, Yale

Tavern or Ora-Don," but then explained that the issue was "whether or not Frank Micoli can give possession to either one of these parties, that's it." The judge asked the attorneys for briefs on the issue of the Trustee and Micoli's authority to execute the leases, explaining "can [they] transfer title to a piece of property under these circumstances, that's all I want to know." The judge explained, "the point that this case is going to turn upon [is] *** whether or not the bank could give the deed or lease based on the action of Micoli."

The parties gave the trial judge the requested briefs, and on October 28, 1991, he granted Ora-Don's motion for a "directed finding." The judge did not make any factual or legal determination whether Yale was ever in possession. He stated:

> "The Court is of the opinion that the plaintiff has failed to meet its burden by a preponderance of the evidence. The question involved here is the right to possession of the premises here. I find that the authority and the power of attorney does not exist in this case giving the agent [Micoli] the right to enter into the lease.
>
> Parenthetically I find [Ora-Don] is not entitled either, although we have no case before us because they received the same type of lease from [Micoli]. But at this point the order will be that the directed finding for the defendant [Ora-Don] and the bank in this case."

■ Yale argues that the trial judge erred by not acting within the scope of a forcible entry and detainer action. The Forcible Entry and Detainer Act (Ill. Rev. Stat. 1991, ch. 110, par. 9—102) provides a summary statutory procedure for determining the sole issue of possession. (*Continental Illinois National Bank & Trust Co. v. Wilson* (1982), 103 Ill. App. 3d 357, 431 N.E.2d 1334.) The purpose of the statute is to quickly restore an aggrieved party to possession of his land and to prevent breaches of the peace caused by the common law method of regaining possession of property through self-help. (*Heritage Pullman Bank v. American National Bank & Trust Co.* (1987), 164 Ill. App. 3d 680, 518 N.E.2d 231; *People v. Evans* (1987), 163 Ill. App. 3d 561, 516 N.E.2d 817.) The statute prohibits any actual or constructive self-help through force, including changing locks or locking someone out of his land. *Evans*, 163 Ill. App. 3d at 564-65.

The statute is in derogation of the common law, and therefore a court hearing a forcible entry and detainer claim is considered "a court of special and limited jurisdiction for that proceeding." (*Clark Oil & Refining Corp. v. Banks* (1975), 34 Ill. App. 3d 67, 71, 339 N.E.2d 283.) Matters not germane to the issue of possession may not be litigated in a forcible entry and detainer action; the action should be "unhampered and unimpeded by questions of title and other collat-

eral matters." (*Rosewood Corp. v. Fisher* (1970), 46 Ill. 2d 249, 255, 263 N.E.2d 833.) The "sole issue to be decided by the court [is] possession, and possession is a quantum of estate far less than title." *Wilson*, 103 Ill. App. 3d at 360; see also *Hale v. Ault* (1980), 83 Ill. App. 3d 78, 403 N.E.2d 635.

Yale argues that, when considering this narrow issue of possession, a forcible entry and detainer court should consider only competing claims of possession and determine which claim is better. It asserts that in this case, when the trial judge simply determined that Yale's lease was not valid but did not measure its claim to possession against Ora-Don's claim, the judge essentially made a declaratory judgment that Yale did not have title and did not reach the question of possession.

■ We have no disagreement with Yale's interpretation of the law regarding the scope of inquiry in forcible entry and detainer cases. But we believe that Yale expanded its claim beyond its right to possession as between Yale and Ora-Don. If Yale wanted an adjudication of only its right to possession, it need only have sued Ora-Don. Instead, it named also the Trustee, the beneficiary Debra Dedich, who had power of direction, Micoli, an alleged agent of Dedich, and even an obscure employee of Ora-Don, Jasper. Yale did not restrict its proof to the *fact* of possession. Instead, it introduced proof to establish its *right* to possession as against Ora-Don *and* against the Trustee, the beneficiary, and the beneficiary's alleged agent. It introduced both leases; it examined Micoli at length to establish that he possessed the authority, actual or apparent, to bind the Trustee and the beneficiary. It also argued that Dedich had ratified the action of Micoli in executing the lease with Yale. Yale's very complaint pleaded the terms of the lease and the power of attorney given by Dedich to Micoli. The character of a pleading must be determined more from its content than its label. (*Barnes v. Southern Ry. Co.* (1987), 116 Ill. 2d 236, 507 N.E.2d 494.) We conclude that the character of the pleading in this case raised the issue of the validity of the lease, and we further conclude that the fact that the complaint was captioned as a forcible entry and detainer action is not controlling.

During oral argument we asked the attorney for Yale why Yale had named the beneficiary and the Trustee as parties in a forcible entry and detainer action. He answered that Yale did so because it believed that it was the beneficiary who had "evicted" Yale and because there was proof that Ora-Don was not incorporated until after Yale had been "evicted." In our judgment those are not sufficient reasons to require that the Trustee, the beneficiary, and Micoli be made parties. It seems clear to us that any adjudication that the

Yale lease was valid would be *res judicata* in any later claim by the Trustee or Dedich that the Yale lease was not valid.

At the close of Yale's evidence, the judge requested briefs from all parties on Illinois land trust law and the right of the Trustee to execute either the Yale or Ora-Don leases. In fact, it was Yale's attorney who suggested briefs on Illinois land trust law. The parties did submit briefs and argued extensively on authority of an agent, particularly apparent authority. At the time the trial judge asked the parties to submit briefs, he raised the question of whether the parties could "transfer title to a piece of property under these circumstances." When the judge said that he was only there to decide whether Yale had the right to possess the property, very significantly, it was the attorney for Yale who said, "But I must tell you that this court does have equity jurisdiction." In the trial court, Yale never raised the argument that it does now that the sole issue was possession.

We note that Yale, in its brief, asks us now to decide the question of the validity of Yale's lease. In other words, on one hand Yale asks us to decide a question of law which, on the other hand, Yale tells us was not before the trial judge and which the trial judge allegedly improperly decided. We agree with the attorney for the Trustee and the beneficiary that Yale's position in this court is inconsistent with its complaint and the position it took in the trial court; it is also self-contradictory. We conclude that the trial judge properly considered the validity of Yale's lease and that that is the sole issue before us.

■ Yale has cited cases which stand for the proposition that a beneficiary may execute a lease for trust property without the trustee. (See, *e.g., Klein v. Ickovitz* (1970), 121 Ill. App. 2d 191, 257 N.E.2d 187; *Southeast Village Associates v. Health Management Associates, Inc.* (1981), 92 Ill. App. 3d 810, 416 N.E.2d 325.) Once again we have no reservations about accepting the principles of law enunciated in the cases cited by Yale. But Yale's argument begs a question. Implicit in Yale's argument is acceptance of the premise that the beneficiary did sign the lease. Acceptance of that premise is in turn based on acceptance of the crucial premise advanced by Yale, and that is that Micoli was the agent of the beneficiary, who had at least apparent authority to bind the beneficiary *in the Yale lease.*

■ In this case, the Yale lease, as well as the Ora-Don lease, provides that the Trustee is the lessor. In this regard, the Yale lease is unlike the leases in *Klein* and *Southeast Village.* In addition, the trust requires the Trustee to obtain a written direction from the beneficiaries before executing any lease. The trust was specifically made a part of Yale's lease agreement. The Trustee did sign the lease. The question then becomes whether the Trustee did in fact obtain a

written direction from the beneficiaries before executing the lease. (*Cf. Kurek v. State Oil Co.* (1981), 98 Ill. App. 3d 6, 424 N.E.2d 56.) Yale contends that the Trustee did receive a written direction from the beneficiary because Micoli gave the Trustee a written direction and showed it to the attorney for Yale. But that written direction empowered Micoli to execute a lease only with 3332, Ltd., and in 1985. That the Trustee and Micoli went beyond their obvious authority is of no significance. We judge that the trial court correctly concluded that the plaintiff had failed to establish that Micoli had authority to execute the Yale lease. We further judge that there is no evidence in the record to support a finding that Dedich ever ratified the actions of Micoli.

It well may be that Yale has some cause of action against the Trustee and Micoli and against Dedich for the return of $5,000 and for other payments made to Micoli and possibly other damages; but it does not have the cause of action which it pleaded and attempted to prove.

We conclude with the observation that this is one more of a long line of cases illustrating the pitfalls facing persons dealing with property held in land trusts. See *Timberline, Inc. v. Towne* (1992), 225 Ill. App. 3d 433, 587 N.E.2d 1149 (and the cases cited therein).

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and GIANNIS, JJ., concur.