# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *Ivanhoe Shoppes, LLC v. Bauspies*, 2021 IL App (2d) 200582

</div>

| | |
|---|---|
| Appellate Court Caption | IVANHOE SHOPPES, LLC, Plaintiff-Appellant, v. JEFFERY BAUSPIES, JAMES BAUSPIES, and LAKE VILLA FITNESS, INC., Defendants-Appellees. |
| District & No. | Second District<br>No. 2-20-0582 |
| Filed | September 2, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 19-LM-1607; the Hon. Michael B. Betar, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James W. Kaiser, of Kaiser, Shepherd & Nakon, P.C., of Wauconda, for appellant.<br><br>John L. Quinn, of Churchill, Quinn, Richtman & Hamilton, Ltd., of Grayslake, for appellees. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

¶ 1    Plaintiff, Ivanhoe Shoppes, LLC, appeals from a judgment of the circuit court of Lake County finding that plaintiff constructively evicted defendants, Jeffery Bauspies, James Bauspies, and Lake Villa Fitness, Inc., and ruling that plaintiff was not entitled to accelerated rent under a written lease. Because the trial court correctly found that plaintiff constructively evicted defendants and that such eviction excused defendants from paying future rent, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Plaintiff was the landlord, and defendants were tenants, under a written commercial lease. The term of the lease was from September 1, 2016, to August 31, 2021. Defendants rented two units in a shopping center and used the space to operate a Snap Fitness (Snap) franchise. The monthly rent was $5078.34.

¶ 4    Beginning in August 2018, defendants started paying less than full rent. By August 2019, defendants owed back rent and late fees of $20,967.14. Plaintiff sent defendants several written notices of the rent owed. On August 20, 2019, plaintiff executed a distress warrant at the premises and changed the locks. On August 21, 2019, plaintiff filed the distress warrant with the court. The warrant stated the amount of rent owed under the lease and attached an inventory of personal property seized (see 735 ILCS 5/9-302 (West 2018)) from defendants to apply toward the rent. Plaintiff later filed a motion to accelerate the rent due under the lease. Defendants filed a counterclaim for damages incurred from being constructively evicted from the premises.

¶ 5    The following facts were established at the bench trial. The distress warrant was executed at about 8 a.m. on August 20, 2019. Plaintiff did not notify defendants of its intent to do so. Plaintiff's property manager, Susanne Eisenberg; plaintiff's attorney; and one of plaintiff's partners entered the premises and conducted an inventory of the personal property. That property consisted primarily of exercise equipment such as elliptical trainers, treadmills, and weight-lifting devices. Plaintiff had a locksmith change the door locks. According to Eisenberg, the locks were changed because the equipment was too large and heavy to readily move, and they were concerned that defendants might move it or sell it before plaintiff could sell it and apply the proceeds toward the rent. She added that plaintiff would have incurred considerable expense to move and store the equipment elsewhere.

¶ 6    When Jeffery arrived at around 9 a.m. to open the business, he discovered that plaintiff's representatives were there and that the locks had been changed. He was allowed to enter. Subsequently, in December 2019, he was allowed to enter twice to obtain property belonging to various customers. Sometime after January 1, 2020, when he asked to enter the premises again, plaintiff's management group denied his request.

¶ 7    According to Eisenberg, in July or August 2019, Jeffery had told her that he knew someone who might be interested in buying the equipment and/or renting the space to operate a gym. Sometime during mid-July to August 2019, Eisenberg discussed the situation with the potential tenant. According to Eisenberg, the person was interested only in the equipment and not in renting the space.

¶ 8    According to Jeffery, defendants had a franchise agreement with Snap. As of August or September 2018, because they were no longer able to pay full rent, defendants decided they

needed to sell the equipment and close. Another Snap franchisee had expressed interest in taking over the gym, but that never came to fruition.

¶ 9 When Jeffery arrived on August 20, 2019, Eisenberg, an attorney, a third person, and a locksmith were already there. Eisenberg let Jeffery into the building. Eisenberg told him that they had a distress warrant and that she was afraid that defendants would take the equipment and sell it. The locks were changed, and Jeffery was never given a key.

¶ 10 According to Jeffery, there was personal property on the premises other than exercise equipment, including club members' property. He could no longer operate the fitness facility once the locks were changed. Because the facility was closed, defendants violated the franchise agreement with Snap. As a result, defendants paid Snap $7500 in liquidated damages. Defendants were also required to refund $1333.97 in membership fees to club members.

¶ 11 Admitted into evidence were several text messages and e-mails from Jeffery to Eisenberg. In the first text, which was undated, Jeffery stated that defendants planned to pay the back rent from the sale of the equipment. Jeffery added that, "[a]s long as you were able to rent the space to someone else, I assumed that you would let us out of the remainder of the lease." Further, Jeffery said, "Snap is letting us out of our agreement, since we do not have the money to pay anything when we close the club."

¶ 12 On July 10, 2019, Jeffery texted Eisenberg that "Snap is going to allow us to close the club, and I have somebody interested in buying all of the assets of the club, and may be interested in renting the space and keeping it as a gym there." The text further stated that Jeffery had given the other person Eisenberg's contact information and that the person should be contacting her to discuss renting the space.

¶ 13 On July 22, 2019, Jeffery e-mailed Eisenberg that he had been working with Snap to close the gym. However, Snap had advised him that if defendants closed the fitness center they would break the franchise agreement and would have to pay between $80,000 and $100,000. He added that he had a meeting the following day with a representative from Snap and that he would tell him that plaintiff had an agreement with a new tenant and that defendants would need to work on getting out of the space. Jeffery expressed hope that would prompt Snap to allow defendants to close the gym with either no or a reduced termination fee. Finally, he asked Eisenberg if plaintiff had reached an agreement with the third party to rent the space.

¶ 14 On July 26, 2019, at 9:14 a.m., Jeffery e-mailed Eisenberg and asked her about the meeting with the potential tenant and whether it looked like plaintiff would reach a deal to rent the space. He told Eisenberg that he was "still waiting to hear back from Snap as to how they can help us out with the closing of the club."

¶ 15 On July 26, 2019, at 4:44 p.m., Jeffery again e-mailed Eisenberg that he had spoken to Snap that afternoon and "they have given the final go ahead to close the club." He added that "[o]ur last day of operation will be August 31, 2019." He asked Eisenberg to let him know how things were progressing with the potential tenant and when he would be taking over the space, because a confirmed new tenant would allow defendants and Eisenberg to discuss how to process "everything at the end of August."

¶ 16 The lease contained, among other things, two provisions pertinent to this appeal. On page seven, under the heading "REMEDIES NOT EXCLUSIVE," the lease provided that the obligation of the lessee to pay rent shall not be deemed to be waived, released, or terminated by "the service of any five-day notice, or other notice to collect, demand for possession, or

notice that the tenancy hereby created will be terminated ***, the institution of any action of forcible detainer or ejectment or any judgment for possession that may be rendered in such action, or any other act or acts resulting in the termination of Lessee's right to possession." Also, on page eight, under the heading "DEFAULT," the lease stated that, if the lessee "violates any of the covenants, conditions or terms of this [lease], Lessee shall be in default." It further provided that if the lessee

> "in any way hinders or limits his ability to do business in accordance with the terms of this Lease, then Lessee shall be in default. This may include, but shall not be limited to, abandonment of the [premises]; the filing of bankruptcy *** or loss or termination of franchise rights."

Finally, the "DEFAULT" provision stated that "[i]n the event of any default by Lessee *** the Lessor may, without notice, accelerate all future rents to become due under lease subsequent to the default *** using all available remedies."

¶ 17     In ruling, the trial court found that plaintiff, by changing the locks, exceeded its authority under the distress warrant. The court also found that plaintiff constructively evicted defendants and that the constructive eviction relieved defendants of any obligation to pay rent, including accelerated rent. The court further found that defendants owed plaintiff, minus credit for their $5000 security deposit, $13,729.19 in back rent. The court, finding for defendants on their counterclaim for $7500 paid to Snap and $1333.97 in refunds to club members, further reduced the judgment to plaintiff to $4895.22. Lastly, the court ordered a sheriff's sale of the equipment to satisfy the judgment.[1] Plaintiff, in turn, filed this timely appeal.

¶ 18                                   II. ANALYSIS

¶ 19     On appeal, plaintiff contends that (1) it did not constructively evict defendants by changing the locks, because it was necessary to do so to prevent defendants from removing and selling the equipment, and (2) it was entitled to accelerated rent because defendants defaulted under the lease when Jeffery announced in the July 26, 2019, e-mail that defendants intended to close the fitness center on August 31, 2019.

¶ 20     On review of a judgment following a bench trial, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010). The judgment will be upheld if there is any evidence supporting it. *Poulokefalos*, 401 Ill. App. 3d at 890.

¶ 21     A landlord's distress remedy arises under section 9-301 of the Eviction Act (Act) (735 ILCS 5/9-301 (West 2018)), which provides, in pertinent part, that in a case of distress for rent the landlord may seize for rent any personal property of the tenant found in the tenant's county of residence. Illinois law grants a landlord a common-law lien on a tenant's personal property for the nonpayment of rent, and that lien is perfected by the filing of a distress warrant and an inventory with the clerk of the court. 735 ILCS 5/9-302 (West 2018).

¶ 22     Here, it is not disputed that plaintiff properly filed a distress warrant and written inventory. By doing so, plaintiff perfected its lien against defendants' exercise equipment. However, plaintiff went further and changed the locks, thereby denying defendants access to the real

---

[1]At oral argument, plaintiff's counsel told the court that defendants had satisfied the judgment and that the exercise equipment remained on the premises.

property. That action exceeded plaintiff's authority under the distress warrant provisions of the Act.

¶ 23 Plaintiff was entitled to seize the exercise equipment and take reasonable steps to prevent defendants from moving or selling the equipment. However, changing the locks was not a proper remedy. Indeed, it was a form of unlawful self-help. See *Yale Tavern, Inc. v. Cosmopolitan National Bank*, 259 Ill. App. 3d 965, 971 (1994) (Eviction Act prohibits self-help through force, such as changing locks).

¶ 24 More importantly, plaintiff's self-help resulted in a constructive eviction. Constructive eviction is a serious and substantial act done by a landlord with the intent to deprive the tenant of the enjoyment of the premises. *Shaker & Associates, Inc. v. Medical Technologies Group, Ltd.*, 315 Ill. App. 3d 126, 134 (2000). There need not be an express intent on the landlord's part to so deprive the tenant, as persons are presumed to intend the natural and probable consequences of their acts. *Shaker & Associates, Inc.*, 315 Ill. App. 3d at 134. Whether there has been a constructive eviction is a question of fact, and the decision of the trier of fact will not be reversed unless it is against the manifest weight of the evidence. *Home Rentals Corp. v. Curtis*, 236 Ill. App. 3d 994, 998 (1992).

¶ 25 Here, by changing the locks, plaintiff deprived defendants of their enjoyment and use of the premises to conduct their fitness business. Thus, plaintiff constructively evicted defendants.

¶ 26 If plaintiff did not wish to remove the property itself, it was not without reasonable alternatives, short of changing the locks, to prevent defendants from removing and selling the equipment. For instance, plaintiff could have monitored the equipment with cameras or other technology to alert its employees if defendants attempted to remove the equipment. Indeed, as Eisenberg testified, the equipment was large and heavy and would not have been easy to remove. Plaintiff could have protected its interest in the equipment short of changing the locks and evicting defendants.

¶ 27 Plaintiff's reliance on *USA I Lehndorff Vermoegensverwaltung v. Cousins Club, Inc.*, 64 Ill. 2d 11 (1976), is misplaced. In that case, the supreme court addressed whether the Illinois statutory provisions applicable to distress for rent were unconstitutional. *Cousins Club, Inc.*, 64 Ill. 2d at 13. Before reaching the dispositive issue, the supreme court noted that under Illinois law a lessor who executes a distress warrant can either seize the tenant's personal property and remove it from the premises or distrain it and allow it to remain on the premises. *Cousins Club, Inc.*, 64 Ill. 2d at 13-14. However, the supreme court never addressed the methods of distress or, more importantly, never suggested that changing the locks would be an acceptable option. Thus, *Cousins Club, Inc.* does not support plaintiff's position.

¶ 28 We next address whether plaintiff, by constructively evicting defendants, lost the right to enforce the lease's acceleration clause. Plaintiff indeed did.

¶ 29 It is well settled that a constructive eviction relieves a tenant of the obligation to pay rent. *Shaker & Associates, Inc.*, 315 Ill. App. 3d at 134. Here, as discussed, plaintiff constructively evicted defendants when it changed the locks. Because defendants no longer could access the premises, they were no longer obligated to pay future rent, including any accelerated rent.

¶ 30 We note that plaintiff relies on *Elliott v. LRSL Enterprises, Inc.*, 226 Ill. App. 3d 724, 729-30 (1992), for the proposition that a lessee's duty to pay rent survives his eviction in an eviction action. Plaintiff's reliance is misplaced, however, as here defendants' eviction was not the

result of an eviction action. Rather, it was because of plaintiff's self-help changing of the locks. Thus, *Elliott* does not support plaintiff's position.

¶ 31 Further, defendants did not terminate the lease or abandon the premises of their own accord. Rather, it was only after plaintiff changed the locks that defendants were unable to access the premises and carry on their business.

¶ 32 Plaintiff, however, points to Jeffery's e-mail of July 26, 2019, in which he stated that Snap was going to allow defendants to close the business and that August 31, 2019, would be their last day. Standing alone, that statement would appear to support plaintiff's position. However, when read in the context of the overall communications with plaintiff regarding defendants' efforts to obtain Snap's permission to withdraw from the franchise agreement and the possibility that plaintiff would reach an agreement to rent the premises to a third party, we do not interpret it as an unequivocal expression of defendants' intent to terminate the lease and abandon the premises. It is better characterized as Jeffery's hope that a deal could be reached with Snap and that plaintiff would find a replacement tenant.

¶ 33 Alternatively, even if the July 26, 2019, e-mail was an unequivocal expression of defendants' intent to close its business on August 31, 2019, plaintiff's action in changing the locks before August 31 effectively evicted defendants from the premises. Up until August 31, defendants could have paid the rent due and remained as tenants. Once plaintiff evicted defendants, that possibility was eliminated.

¶ 34 Plaintiff also asserts that it was entitled to accelerated rent under the exclusive remedies provision of the lease. It was not.

¶ 35 The exclusive remedies provision simply contemplated a situation where plaintiff sought an authorized remedy such as eviction. In such a case, defendants' obligation to pay rent would continue, and if plaintiff collected any rent, its right to other remedies would remain unaffected. That provision, however, did not permit plaintiff to collect accelerated rent after resorting to the unlawful self-help remedy of constructive eviction.

¶ 36 Because we hold that plaintiff constructively evicted defendants and that defendants were not obligated to pay accelerated rent, we need not decide whether plaintiff made reasonable efforts to mitigate damages by attempting to rent to someone else. See 735 ILCS 5/9-213.1 (West 2018); *Snyder v. Ambrose*, 266 Ill. App. 3d 163, 166 (1994).

¶ 37                                    III. CONCLUSION
¶ 38 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 39 Affirmed.