2021 IL App (1st) 191974-U
No. 1-19-1974
Order filed October 12, 2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| SWEITZER PROPERTIES, LLC, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois, |
| Plaintiff-Appellee, | ) | Municipal Dept., Second District |
| | ) | |
| v. | ) | No. 2016 M2 0629 |
| | ) | |
| CHRISTOPHER DAVIS and ANNA DAVIS, | ) | |
| | ) | The Honorable Jeffery L. Warnick |
| Defendants/Appellants. | ) | Judge Presiding |
| | ) | |
| v. | ) | |
| | ) | |
| SWEITZER PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant/Appellee. | ) | |

JUSTICE WALKER delivered the judgment of the court.
Presiding Justice Hyman and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*:  When a landlord tells a prospective tenant that leased property is safe, clean, and healthy, thereby inducing the prospective tenant to sign a lease, and the property has high levels of mold and a significant problem with mice, the landlord is liable for constructive eviction.

¶ 2     Sweitzer Properties sued Christopher and Anna Davis for breach of a lease, and they countersued for constructive eviction. The trial court, applying the doctrine of *caveat lessee*,

1

entered a judgment in favor of Sweitzer Properties. The Davises contend on appeal that the evidence does not support the trial court's order, and the court imposed unjustified penalties on the Davises.

¶ 3    We find that our supreme court has expressly rejected the doctrine of *caveat lessee*, Sweitzer Properties leased to the Davises a property that was unfit for the Davises' purposes, and Sweitzer Properties failed to remediate the problems promptly. Accordingly, we reverse the judgment entered in favor of Sweitzer Properties and remand for entry of a judgment in favor of the Davises.

¶ 4                                        I. BACKGROUND

¶ 5    In June 2014 Sweitzer Properties leased a house to the Davises for two years at $4,200 per month. The Davises moved in on July 2, 2014, and they moved out on August 1, 2014. Sweitzer Properties sued the Davises for breach of the lease. The Davises countersued for constructive eviction. In June 2014, before the Davises moved in, the preceding tenants told Rick Sweitzer, the owner of Sweitzer Properties about water damage in the basement. Rick sent an employee of Sweitzer Properties, George, who attempted to repair the damage by replacing some of the drywall and putting in a vent.

¶ 6    At trial Christopher testified that during negotiations for the lease, he told Rick that the Davis family needed a safe and healthy home for their children, Cosima, then 3 years old, and Pil, almost one. Christopher told Rick that Cosima had undergone open heart surgery, and they especially needed a clean environment to protect her health. Christopher testified that Rick guaranteed the house was safe, clean, and healthy. Christopher and Anna looked at the house with their realtor before signing the lease. They spent about 30 minutes in the house while the tenants who preceded the Davises still lived there.

¶ 7       After the Davises moved in, they sent Rick a picture of the mold growing around the area of the repairs in the basement. Anna sent an email to Rick dated July 15, 2014, reminding Rick of the problems shown in the photographs she had sent. Rick told the Davises they could wash any mold off the wall with bleach. Anna testified that the mold kept growing back faster.

¶ 8       Christopher testified that shortly after his family moved in, he found mousetraps in the basement. Anna testified that on July 14, 2014, less than two weeks after the move, she saw a mouse tail hanging out of a pipe over her head in the basement ceiling. The mouse ran off. The Davises informed Rick about the problem and called in exterminators who set more traps. The Davises also told Rick that the movers said they heard rodent noises in the basement while they moved in the furniture. Rick replied by email, dated July 16, 2014, that he spoke to George about mice, and George "did not sound surprise[d] but would not confirm whether or not he had experience[d] this before. He said they are little anyway so no big deal."

¶ 9       Christopher testified that he saw a mouse in the kitchen on July 27, 2014. The Davises then looked around more thoroughly and found mouse droppings throughout the house, but especially in the kitchen. Anna testified that the mice had "bitten through *** our son's bottles, the nipples of the bottles, and also the pacifier." The family stayed at a hotel on July 28. Christopher sent Rick an email on August 1, 2014, saying:

> "I shared with you my daughter's medical history because above and beyond anything her health (and that of my son) is the most important concern I will ever have. To be blunt the conditions of the house are not appropriate for children, much less one with my daughter's history. *** [T]he biggest issues are the recurrent mold in the basement and the mouse infestation.

*** [W]e have spoken to several specialists (including Orkin who has been to the home), and they all agree that the mouse problem is likely long-standing and began well before we moved in.

Orkin has been to the home to lay traps and assess for holes to cover. They state that the holes are many and in places they can't access like behind the dishwasher They also state the problem will take weeks to months to resolve. *** [Anna] and baby both have developed rashes that the dermatologist suspects might be related to the mice, and they are on medication now. ***

I am reaching out to you to find out what solution you have to these significant problems. Our rent payment has been postponed while this is sorted out."

¶ 10　　　　The parties stipulated that the realtor who accompanied the Davises when they visited the house saw no evidence of mice, mold, or other unhealthy conditions. Sweitzer Properties presented a doctor who said the house remained habitable and the mice and the mold did not create a significant health hazard. The doctor admitted he would not want to live in a house with the mice and mold shown in the exhibits. A microbial consultant found moderate to heavy levels of three common molds. The consultant described the most pervasive mold as "[k]nown to be allergenic and many species also produce mycotoxins and carcinogens. They are a common cause of extrinsic ast[h]ma and hypersensi[ti]vity pneumonitis. Many species are opportunistic pathogens and are known to cause sinus lesions, ear infections, respiratory infections, and invasive systemic disease."

¶ 11　　　　The court stated:

"At that walk-through *** whether or not the Davises chose to look into closets, look into utility rooms, look into refrigerators, that's their doing. That's their choice.

4

The landlord and the Sweitzer Properties are not responsible for what they chose or didn't choose to do.

When one starts looking at a property either to rent or to purchase, and after being around a few years here and purchasing a number of properties, you learn that you don't respect the privacy -- or you shouldn't prudently respect the privacy of the prior owners or tenants. You should look out for your own interest and find out about the property.

…...I would never look into the basement of a property without inspecting *** the baseboards of all basements to find out if I've got any *** signs of water damage right there, *** checking *** cabinets and any issues in the basement or the kitchen for mouse droppings.

***

*** [T]here is no evidence whatsoever that Mr. Sweitzer had any preexisting knowledge that this place had a mouse problem.

*** Mr. Sweitzer really didn't get a good opportunity to get his old tenant out to have an opportunity to come through, walk through, inspect, and, perhaps, fix or clean things that he might have wanted to do.· And whose fault was that?· It was the Davises'.

· · · · · · · ·They wanted to get in early.· They needed to get in by July 2nd, the very day that the [prior tenants] were moving out."

¶ 12    The court found the Davises liable for breaching the lease. The court ordered them to pay a full year's rent, and the court added penalties to bring the total judgment to $96,451.16. The Davises now appeal.

¶ 13                                      II. ANALYSIS

¶ 14        The Davises argue on appeal that the evidence proves constructive eviction, and the court imposed excessive penalties.  Under the doctrine of constructive eviction, the tenant is justified in abandoning the premises, if, because of the landlord's breach of his covenant to repair, the leased premises become unfit for the purpose for which they were leased.  The question of constructive eviction is one of fact and a reviewing court will not disturb the finding unless it is against the manifest weight of the evidence.  *American National Bank & Trust Co. v. Sound City, U.S.A., Inc.*, 67 Ill. App. 3d 599, (1979).

¶ 15        The trial judge's explanation for his ruling shows that he placed on the tenants the entire burden of finding out, before signing the lease, whether the landlord misrepresented the condition of the leased property.  Our supreme court explained the relevant principles:

"[An] imbalance *** exists in modern landlord-tenant relationships, where tenants have far less bargaining power and capacity to inspect and maintain premises than landlords. [Citation.] The seminal case on this subject is *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351 (1972), in which this court rejected the doctrine of *caveat lessee ***.

*** [T]he implied warranty of habitability *** protect[s] today's purchasers, who generally do not possess the ability to determine whether the houses they have purchased contain latent defects.

*** [T]he warranty is applicable against a lessor or builder of a residential unit where latent defects thereabout interfere with the inhabitant's reasonable expectation that the unit will be suitable for habitation."  *Board. of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 424-26 (1999).

¶ 16          In *Jack Spring*, 50 Ill. 2d at 363-65 the court stated:

"[W]e believe that the consumer protection cases *** require that the old rule be abandoned to bring residential landlord-tenant law into harmony with the principles on which those cases rest.

* * *

Our approach to the common law of landlord and tenant ought to be aided by principles derived from the consumer protection cases ***. In a lease contract, a tenant seeks to purchase from his landlord shelter for a specified period. The landlord sells housing as a commercial businessman and has much greater opportunity, incentive, and capacity to inspect and maintain the condition of his building. Moreover, the tenant must rely upon the skill and bona fides of his landlord at least as much as a car buyer must rely upon the car manufacturer. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant's position corresponds precisely with the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose."

¶ 17          The trial court here relied strictly on the rejected doctrine of *caveat lessee*. We cannot reconcile the trial court's reasoning with the principles of *Jack Spring* and *Hoffman Group*. The trial court's factual findings do not justify the judgment entered against the Davises.

¶ 18          We must determine whether to remand for retrial or direct an entry of a judgment in favor of the Davises.  To answer this question, we must decide whether the evidence at trial leaves

unresolved any issue of whether the premises were "unfit for the purpose for which they were leased." *Dell'Armi Builders, Inc. v. Johnston*, 172 Ill. App. 3d 144, 148 (1988).

¶ 19    Anna and Christopher both testified that they told Rick about their special concern with the cleanliness of the house. Sweitzer Properties offered no evidence to contradict their testimony that Rick told them the house was clean and suitable for their purposes. Sweitzer Properties argued only that after the Davises found mold and mice, they did not give Sweitzer Properties a sufficient opportunity to remediate. Rick admitted that the prior tenants informed him of the water damage before the Davises moved in, and Sweitzer Properties did not relay the information to the Davises. Soon after they moved in, the Davises told Rick they saw mold growing. Rick also admitted that by July 14, 2014, the Davises informed him that Anna had seen mice and Christopher found the old mousetraps. The evidence shows that Sweitzer Properties had not effectively corrected either problem before the Davises moved out on August 1, 2014. Sweitzer Properties had at least two weeks to cure the problems and make the property conform to the representations Rick made to induce Christopher and Anna to sign the lease.

¶ 20    In *Home Rentals Corp. v. Curtis*, 236 Ill. App. 3d 994, 999 (1992), the court held:

"Considering the magnitude of the problems, four days was opportunity enough for Home Rentals to act. Constructive eviction has been found in analogous circumstances where an even shorter period was involved. [Citation.] We note, moreover, that there is no indication that giving Home Rentals additional time would have made any difference. In the four days before defendants left, the only action the company took at all was to send someone out to spray for bugs, which did not work, and to dispatch a man with a plunger."

See also *Applegate v. Inland Real Estate Corp.*, 109 Ill. App. 3d 986, 989 (1982) (tenant moved in on October 29 and moved out October 31 because of roaches, filth, and disrepair).

¶ 21 Under the consumer protection principles that the *Jack Spring* court held applicable to leases, "the warranty of merchantability, [and] fitness for the particular purpose of the buyer *** are the criteria for determining whether warranties have been satisfied. Conversely, there is a breach of warranty by proof that these criteria have not been satisfied. Failure to satisfy the criteria are the significant matters without regard to whether the goods are `defective' or without a flaw." *Malawy v. Richards Manufacturing Co.*, 150 Ill. App. 3d 549, 559-60 (1986); see also *Rubin v. Marshall Field & Co.* 232 Ill. App. 3d 522, 529 (1992). Thus, even if someone might find the property habitable with mice and mold, the property did not conform to the purposes of the Davises, purposes about which the Davises adequately notified Sweitzer Properties.

¶ 22 The evidence cannot support a finding that Sweitzer Properties met its obligation to provide a clean, safe, and healthy home suitable for the purposes the Davises leased the home. We reverse the judgment entered in favor of Sweitzer Properties and remand for entry of a judgment in favor of the Davises on their claim for constructive eviction and for an award of damages.

¶ 23                                        III. CONCLUSION

¶ 24 Although Sweitzer Properties knew of the Davises' need for a clean, healthy home, it leased a house with unremedied mold and an infestation of mice. The failure to remediate the problems promptly amounted to constructive eviction. Accordingly, we reverse the judgment

entered in favor of Sweitzer Properties, and we remand for the trial court to enter a judgment in favor of the Davises and award of damages for constructive eviction.

¶ 25       Reversed and remanded.